1

2

3

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT

8                  FOR THE EASTERN DISTRICT OF CALIFORNIA

9   TELICIA BENSON,

10            Plaintiff,                    No. 2:08-cv-0886 JFM PS

11      vs.

12
    CALIFORNIA CORRECTIONAL
13  PEACE OFFICERS ASSOCIATION,

14            Defendant.                    ORDER

15  _____/

16            The parties have consented to proceed before the undersigned for all purposes.

17  See 28 U.S.C. § 636(c).  Pending before this court is defendant's motion for summary judgment.

18  The court has determined that the matter shall be submitted upon the record and briefs on file

19  and accordingly, the date for hearing of this matter shall be vacated.  Local Rule 230.  Upon

20  review of the motions and the documents in support and opposition, and good cause appearing

21  therefor, THE COURT FINDS AND ORDERS AS FOLLOWS:

22                         **PROCEDURAL BACKGROUND**

23            On April 28, 2008, plaintiff filed a complaint against the California Correctional

24  Peace Officers Association (the "CCPOA") and individual defendants Debbie Rollins, Jeff

25  Nicolaysen, and Mary Burton alleging violations of Title I and V of the Americans with

26  Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; Title VII of the Civil Rights Act, 42 U.S.C.

1

§ 4200e *et seq.*; and the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d).  (Doc. No. 1.)  On November 17, 2008, defendants filed a motion to dismiss.  (Doc. No. 15.)  On December 19, 2008, this court issued an order partially granting the motion to dismiss.[1]  (Doc. No. 25.)  The court found plaintiff failed to state a claim as to any of the individual defendants, and failed to exhaust her administrative remedies as to her Title V ADA claim and Title VII Civil Rights Act claim.  (Id.)

On January 20, 2009, plaintiff filed an amended complaint against the CCPOA alleging a violation of Title I of the ADA and a violation of the EPA.  (Doc. No. 26.)  Plaintiff claims the CCPOA violated the ADA by failing to accommodate her return to work.  Plaintiff also claims the CCPOA violated the EPA by failing to pay her and a male employee equally for similar work.  Plaintiff seeks reimbursement of salary, wage increases, cost of living increases, reinstatement of her retirement funds, as well as full medical supervision for the mental stress she sustained by the CCPOA.  Finally, plaintiff seeks $4,000,000.00 in damages for pain and suffering.

On February 13, 2009, the CCPOA filed an answer to the amended complaint. (Doc. No. 28.)  On December 21, 2009, the CCPOA filed a motion for summary judgment. (Doc. No. 54.)  On January 20, 2010, plaintiff was given an extension by which to file her opposition.  (Doc. No. 60.)  Plaintiff filed an opposition on February 11, 2010.  (Doc. No. 62.)

**FACTS**

The CCPOA is a labor union representing various employees of the State of California Department of Corrections and Rehabilitation.  (Nicolaysen Decl. ¶ 1.)  Plaintiff began her employ with the CCPOA on September 28, 1998 as a full-time permanent receptionist.

/////

---

[1]The order was initially filed as "findings and recommendations," but due to the consent of both parties to jurisdiction by the undersigned, the matter was subsequently designated an order.  (See Doc. No. 27.)

1  (Id. ¶ 4; Benson Dep. at 44.)  Plaintiff's pay scale, the General Secretary scale, was tiered,

2  providing for step increases per year of employment.  (Nicolaysen Decl. ¶ 4.)

3        In October 1999, plaintiff changed positions from receptionist to a secretary for

4  the CCPOA Executive Counsel.  (Nicolaysen Decl. ¶ 5.)  In this new position, plaintiff's pay

5  increased by one step on the General Secretary pay scale.  (Id.)

6        In January 2003, plaintiff, while still employed as a secretary to the Executive

7  Counsel, applied for an Editorial Assistant position with the CCPOA Peacekeeper Magazine.

8  (Nicolaysen Decl. ¶¶ 6-7.)  Plaintiff was offered and accepted that position mid-January 2003;

9  she began work in April 2003.  (Id. ¶ 6.)  Because her duties were similar to those of her

10  previous position, the Editorial Assistant position was considered a lateral transfer rather than a

11  promotion and she continued to be paid pursuant to the General Secretary scale.  (Id. ¶¶ 6, 8.)

12        As an Editorial Assistant, plaintiff was supervised by Patty Sewall, Editor of the

13  CCPOA Peacekeeper Magazine.  (Nicolaysen Decl. ¶ 7.)  In January 2004, plaintiff took a leave

14  of absence from work claiming that she was having difficulties working with Ms. Sewall.  (Id.;

15  Benson Dep. at 107-09.)

16        Plaintiff returned to work in February 2004, where she was assigned to Debbie

17  Rollins, the Meeting Coordinator for the CCPOA who oversaw the Membership Department.

18  (Id. ¶ 8.)  Ms. Rollins was the person to whom Ms. Sewall reported.  (Id.)

19        Under new supervision, plaintiff continued to have duties as an Editorial

20  Assistant, but she was also given additional activities within the Membership Department.

21  (Nicolaysen Decl. ¶ 8.)  Plaintiff continued to be paid under the General Secretary pay scale.

22  (Id.)

23        While in the Membership Department, plaintiff worked with Ralph Guerriero, a

24  male employee who was employed by the CCPOA as a Membership Records Clerk in the

25  Membership Department.  (Nicolaysen Decl. ¶ 20; Benson Dep. at 226.)  Mr. Guerriero was

26  hired by the CCPOA in April 1997 and spent his entire employment in the Membership

3

1   Department as a Membership Records Clerk.  (<u>Id.</u> ¶ 26.)  Mr. Guerriero was paid according to

2   the Membership Records Clerk pay scale, which was similar to the General Secretary pay scale

3   in that it involved a multi-tiered system of pay.  (<u>Id.</u> ¶ 21.)

4           In February 2004, Mr. Guerriero was being paid at a higher rate than the rate used

5   to pay plaintiff and he continued to be paid more than plaintiff until her employment with the

6   CCPOA terminated.  (Nicolaysen Decl. ¶ 21.)

7           Plaintiff assisted Mr. Guerriero with his duties.  (Nicolaysen Decl. ¶ 22; Benson

8   Dep. at 120-22.)  Although plaintiff did perform some of the duties that Mr. Guerriero

9   performed, she continued to perform at least some of the duties of an Editorial Assistant.

10  (Nicolaysen Decl. ¶ 22.)  Mr. Guerriero also performed the following duties that plaintiff did not

11  perform:

12          a)      Mr. Guerriero ran a variety of reports regarding membership information;

13          b)      Mr. Guerriero interfaced with the CCPOA Information Technology Department

14                  on the types of membership reports that were needed and their formatting;

15          c)      Mr. Guerriero worked with the State of California to keep membership records

16                  accurate;

17          d)      Mr. Guerriero regularly reported on membership trends to the Chief of Logistics;

18          e)      Mr. Guerriero oversaw certain portions of the Victims March on the Capital

19                  event;

20          f)      Mr. Guerriero ran the merchandise booth at the annual CCPOA conventions.

21  (Nicolaysen Decl. ¶¶ 23-24.)  Mr. Guerriero also trained plaintiff when she began work in the

22  Membership Department.  (Benson Dep. at 98.)

23          Over time, personality conflicts also arose between plaintiff and Ms. Rollins,

24  which the latter attributed to plaintiff's work performance and work habits, including

25  maintaining time sheets, tardiness and absenteeism.  (Nicolaysen Decl. ¶ 9; Benson Dep. at 106-

26  08, 130-31, 143.)

1    In February 2006, plaintiff did not return to work, claiming that she was unable to

2    continue working due to stress she was experiencing as a result of her relationship with Ms.

3    Rollins.  (Nicolaysen Decl. ¶ 10.)  Plaintiff returned to work once on March 6, 2006 and worked

4    for four hours, but did not return to work thereafter.  (Id.; Benson Dep. at 171.)

5    On March 8, 2006, plaintiff filed a worker's compensation claim in which she

6    alleged that she was experiencing "verbal abuse" when interacting with her supervisor.

7    (Nicolaysen Decl., Ex. B.)

8    On March 20, 2006, then-CCPOA Chief of Logistics, Jeff Nicolaysen[2], received a

9    letter from Mark Becker, Psy.D., of The Permanente Medical Group regarding plaintiff's "stress

10    related symptoms."  (Nicolaysen Decl. ¶ 2; Ex. C.)  In this letter, Dr. Becker, who first saw

11    plaintiff on March 13, 2006, noted that plaintiff "has experienced disruptions in her daily

12    functioning due to reported harassment by her supervisor.  Her stress-related symptoms have

13    worsened recently and appear to be connected with her fear of further harassment and retaliation

14    by her superior upon her return to work."  (Nicolaysen Decl., Ex. C.)  Dr. Becker's

15    recommendation was that plaintiff not be expected to work with her alleged harasser, Ms.

16    Rollins.  (Id.)

17    Although the CCPOA did not agree that plaintiff suffered from a stress disability,

18    Mr. Nicolaysen claims he attempted to facilitate plaintiff's return to work by investigating any

19    positions at the CCPOA for which plaintiff was qualified that did not require plaintiff to work

20    under the supervision of Ms. Rollins.  (Nicolaysen Decl. ¶ 13.)

21    On April 6, 2006, Mr. Nicolaysen sent a letter to plaintiff indicating that no

22    positions existed other than the one she left and that the CCPOA was not willing to remove Ms.

23    /////

24

25    [2]As the Chief of Logistics, Mr. Nicolaysen's duties involved administrative functions, finance, and human resources, including overseeing personnel issues.  (Nicolaysen Decl. ¶ 2.)

26    Mr. Nicolaysen is presently employed by the CCPOA as Chief Financial Officer.  (Id.)

1   Rollins from her position in order to facilitate plaintiff's return to work.  (Nicolaysen Decl., Ex.

2   D.)

3          On April 18, 2006, Mr. Nicolaysen sent a second letter to plaintiff repeating that

4   no other positions for which plaintiff was qualified existed at the CCPOA other than the one in

5   which plaintiff would report to Ms. Rollins.  (Nicolaysen Decl., Ex. E.)  Mr. Nicolaysen did,

6   however, state that they would be willing to work on alternative processes – for example,

7   plaintiff could return to her position as Editorial Assistant reporting to Ms. Rollins while Mr.

8   Nicolaysen himself would meet with plaintiff periodically to discuss and deal with any work-

9   related issues.  (Id.)

10          On April 19, 2006, the CCPOA received a letter from Dr. Becker indicating that

11   plaintiff could return to work on modified duties from April 19 to May 4, 2006.  (Nicolaysen

12   Decl. Ex. F.)  The modification noted by Dr. Becker was that plaintiff would work for that

13   fifteen-day period under a supervisor other than Ms. Rollins.  (Id.)  Plaintiff, however, did not

14   report for work during that time period.  (Id.)

15          On May 4, 2006, plaintiff was again examined by Dr. Becker, who noted in his

16   report that plaintiff may return to work between May 11, 2006 and June 8, 2006 under modified

17   conditions, the modification being that plaintiff "not work under the authority of her primary

18   supervisor as per letter dated [March 20, 2006]."  (Pl.'s Opp'n, Ex. 7 at 2-3.)  Plaintiff, however,

19   did not return to work then or at any time thereafter, and she did not contact CCPOA any further

20   about her employment.  (Nicolaysen Decl. Ex. F.)

21          Per the CCPOA Employee Handbook dated August 1, 1999, which was in effect

22   in 2006 and applied to all CCPOA employees, including plaintiff, an employee is considered to

23   have voluntarily terminated her employment if the employee failed to report for work without

24   notice to his or her supervisor or department head for five consecutive work days.  (Nicolaysen

25   Decl. ¶ 17; Ex. G.)

26   /////

1    On May 22, 2006, Mr. Nicolaysen sent a third letter to plaintiff advising her that,

2    since she had not contacted the CCPOA to further discuss her return to work, had not returned to

3    work, and had not produced a doctor's statement excusing her from returning to work, the

4    CCPOA regarded her as having resigned her position and thus notified her that she was no

5    longer employed by the CCPOA.  (Nicolaysen Decl. ¶ 18; Ex. H.)  At the time Mr. Nicolaysen

6    sent this letter, plaintiff, with the exception of the four hours that she worked on March 6, 2006,

7    had not worked at the CCPOA in over three months.  (Nicolaysen Decl. ¶ 19.)

8                     **SUMMARY JUDGMENT STANDARDS UNDER RULE 56**

9    Summary judgment is appropriate when it is demonstrated that there exists "no

10   genuine issue as to any material fact and that the moving party is entitled to a judgment as a

11   matter of law."  Fed. R. Civ. P. 56(c).

12   Under summary judgment practice, the moving party

13   always bears the initial responsibility of informing the district
     court of the basis for its motion, and identifying those portions of
14   "the pleadings, depositions, answers to interrogatories, and
     admissions on file, together with the affidavits, if any," which it
15   believes demonstrate the absence of a genuine issue of material
     fact.
16

17   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the

18   nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

19   judgment motion may properly be made in reliance solely on the 'pleadings, depositions,

     answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be
20
     entered, after adequate time for discovery and upon motion, against a party who fails to make a
21
     showing sufficient to establish the existence of an element essential to that party's case, and on
22
     which that party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of
23
     proof concerning an essential element of the nonmoving party's case necessarily renders all
24
     other facts immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so
25
     long as whatever is before the district court demonstrates that the standard for entry of summary
26

                                                    7

1  judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

2        If the moving party meets its initial responsibility, the burden then shifts to the

3  opposing party to establish that a genuine issue as to any material fact actually does exist. See

4  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

5  establish the existence of this factual dispute, the opposing party may not rely upon the

6  allegations or denials of its pleadings but is required to tender evidence of specific facts in the

7  form of affidavits, and/or admissible discovery material, in support of its contention that the

8  dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

9  must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

10  of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

11  (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

12  1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

13  return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

14  1436 (9th Cir. 1987).

15        In the endeavor to establish the existence of a factual dispute, the opposing party

16  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

17  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

18  versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

19  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

20  genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

21  committee's note on 1963 amendments).

22        In resolving the summary judgment motion, the court examines the pleadings,

23  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

24  any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed. See Anderson,

25  477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

26  court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587.

1    Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

2    produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

3    Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

4    1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

5    show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

6    as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

7    'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

8                                              **ANALYSIS**

9               Defendant seeks summary judgment on both of plaintiff's claim.  As to plaintiff's

10   first claim, defendant argues (1) plaintiff is not disabled within the meaning of the Americans

11   with Disabilities Act, 42 U.S.C. § 12101 et seq.; (2) defendant did attempt to facilitate plaintiff's

12   return to work, but plaintiff broke down the interactive process; and (3) plaintiff was deemed

13   terminated because she stopped coming to work and communicating with the CCPOA, not

14   because of any disability.  As to plaintiff's second claim, defendant argues plaintiff did not

15   perform equal work at a job that required equal skill, effort and responsibility and was performed

16   under similar working conditions than that of the male co-worker at issue and that any pay

17   differentials were based on lawful criteria.

18              In her opposition, plaintiff asserts that the 2008 amendments to the ADA

19   emphasize that the definition of disability should be in favor of broad coverage of individuals

20   and generally should not require extensive analysis.  Plaintiff states she was a qualified

21   individual, asserts defendant could have made reasonable accommodations for her return to

22   work, and claims she was fired because of her disability.[3]  Plaintiff further asserts she performed

23

24              [3]  Plaintiff also asserts a retaliation claim for the first time in her opposition to
     defendant's motion for summary judgment.  Plaintiff, however, may not present new claims in
25   this manner.  See Wasco Prods., Inc. v. Southwall Techs., Inc., 435 F.3d 989, 992 (9th Cir. 2006)
     (" 'Simply put, summary judgment is not a procedural second chance to flesh out inadequate
26   pleadings.' ")

1   the same job duties that required the same amount of skill as well as equal effort and

2   responsibility as her male coworker and should have been paid accordingly.

3   **1.      The Americans with Disabilities Act**

4           Plaintiff first claims the CCPOA violated the Americans with Disabilities Act, 42

5   U.S.C. § 12101 *et seq.* for failing to provide reasonable accommodations.

6           The ADA prohibits employers from "discriminat[ing] against a qualified

7   individual with a disability," 42 U.S.C. § 12112(a), and requires employers to provide

8   "reasonable accommodations to the known physical or mental limitations of an otherwise

9   qualified [employee] with a disability," id. § 12112(b)(5)(A).  The ADA defines "disability," in

10  pertinent part, as "a physical or mental impairment that substantially limits one or more of the

11  major life activities of such individual."  42 U.S.C. § 12102(2).  "Major life activities," in turn,

12  are defined to mean "functions such as caring for oneself, performing manual tasks, walking,

13  seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. § 1630.2(i).  Further,

14  "[t]he term substantially limits means significantly restricted in the ability to perform either a

15  class of jobs or a broad range of jobs in various classes as compared to the average person

16  having comparable training, skills and abilities. The inability to perform a single, particular job

17  does not constitute a substantial limitation in the major life activity of working."  Id. §

18  1630.2(j)(3)(i).

19                          **A.      "Qualified Individual"**

20          To state a claim of discrimination under the ADA, a plaintiff must establish that

21  he or she is a "qualified individual."  See 42 U.S.C. § 12112(a).  The ADA defines a "qualified

22  individual," in part, as "an individual with a disability who, with or without reasonable

23  accommodation, can perform the essential functions of the employment position...."  42 U.S.C.

24  § 12111(8).  The individual must also "satisf[y] the requisite skill, experience, education and

25  other job-related requirements of the position."  Bates v. United Parcel Service, Inc., 511 F.3d

26  974, 990 (9th Cir. 2007) (en banc).

1    Upon examination of the pleadings, the court does not find plaintiff to be a

2    qualified individual under the ADA.  Plaintiff's disability – as asserted both by her and Dr.

3    Marks – is the stress and anxiety that plaintiff experienced while working for her supervisor, Ms.

4    Rollins.  Plaintiff, however, fails to show how her work-related stress has "substantially limited"

5    her major life activity of working.  See 42 U.S.C. § 12111(8).  To the contrary, Plaintiff states

6    that the only obstacle to performance of her job was the stress of reporting to Ms. Rollins.

7    (Benson Dep. at 184-85: 6-21; 189:16-20; 210:20-23.)  In all other respects, plaintiff was willing

8    and capable of performing the requirements of her position.  (Benson Dep. at 195-196.)  It is

9    evident, then, that plaintiff's disability was situational and not applicable to a class of jobs or a

10   broad range of jobs in various classes.  See 29 C.F.R. § 1630.2(j)(3)(i) ("The inability to perform

11   a single, particular job does not constitute a substantial limitation in the major life activity of

12   working").

13   Because plaintiff's alleged disability only precludes her from working for a

14   particular supervisor, the court finds she is not disabled as defined under the ADA and is,

15   therefore, not a qualified individual.  See also  Weiler v. Household Finance Corp., 101 F.3d

16   519, 524 (7th Cir. 1996) ("The major life activity of working is not 'substantially limited' if a

17   plaintiff merely cannot work under a certain supervisor because of anxiety and stress related to

18   his review of her job performance.").

19   **B.      Reasonable Accommodation**

20   Assuming arguendo plaintiff was a qualified individual under the ADA, the court

21   further finds defendant offered reasonable accommodations, but that plaintiff did not participate

22   in the interactive process.

23   Upon an employer's awareness of an employee's disability, an interactive process

24   begins whereby the employer and employee communicate with each other regarding possible

25   reasonable accommodations.  See Zivkovic v. Southern California Edison Co., 302 F.3d 1080,

26   1089 (9th Cir. 2002).  The interactive process requires: (1) direct communication between the

employer and employee to explore in good faith the possible accommodations; (2) consideration

of the employee's request; and (3) offering an accommodation that is reasonable and effective.

Id. "A party that fails to communicate, by way of initiation or response, may . . . be acting in bad

faith." Humphrey v. Memorial Hospitals Ass'n, 239 F.3d 1128, 1137 (9th Cir. 2001) (citing

Beck v. University of Wis. Bd. Of Regents, 75 F.3d 1130, 1135 (7th Cir. 1996)).

The ADA specifically lists reassignment to a vacant position as a type of

reasonable accommodation.  42 U.S.C. § 12111(9)(B).  An employer, however, is not required to

change a person's supervisor as a form of reasonable accommodation.  See EEOC Enforcement

Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with

Disabilities Act.  Nonetheless, the ADA may require that other supervisory methods be explored.

Id.

Examination of the record reveals that defendant did attempt to offer plaintiff

reasonable accommodations to facilitate her return to work, but that the interactive process failed

due to plaintiff's failure to communicate with defendant.  Upon learning of plaintiff's disability

through a letter from Dr. Becker dated March 20, 2006, Mr. Nicolaysen attempted to determine

whether there existed any vacant positions for which plaintiff was qualified and which did not

require plaintiff to report to Ms. Rollins.  On April 6, 2006, Mr. Nicolaysen sent a letter to

plaintiff indicating that no such positions existed other than the one she left and that the CCPOA

was not willing to remove Ms. Rollins from her position in order to facilitate plaintiff's return to

work.

Curiously, in her opposition, plaintiff argues defendant failed to offer a

reasonable accommodation, including the possibility of allowing her to return to work under the

supervision of Mr. Nicolaysen.  (Pl.'s Opp'n at 9.)  On April 18, 2006, however, Mr. Nicolaysen

sent a second letter to plaintiff repeating that no other positions for which plaintiff was qualified

existed at the CCPOA other than the one in which plaintiff would report to Ms. Rollins, but that

the CCPOA would be willing to work on alternative processes – for example, plaintiff could

1   return to her position as Editorial Assistant reporting to Ms. Rollins while Mr. Nicolaysen

2   himself would meet with plaintiff periodically to discuss and deal with any work-related issues.

3   Per the interactive process, if plaintiff was dissatisfied with this option, then it was her

4   responsibility to communicate with Mr. Nicolaysen to discuss the possibility of working directly

5   under his supervision.  Plaintiff, however, did not respond to any of Mr. Nicolaysen's

6   communications.

7           Accordingly, the court finds that defendant offered a reasonable accommodation

8   to facilitate plaintiff's return to work and that plaintiff failed to participate in the interactive

9   process.

10                    **C.        Termination of Employment**

11          To the extent plaintiff asserts her employment was terminated due to her

12   disability, the court disagrees.  Per the CCPOA Employee Handbook dated August 1, 1999,

13   which was in effect in 2006 and applied to all CCPOA employees, including plaintiff, an

14   employee is considered to have voluntarily terminated her employment if the employee failed to

15   report for work without notice to his or her supervisor or department head for five consecutive

16   work days.  (Nicolaysen Decl. ¶ 17; Ex. G.)

17          On May 22, 2006, Mr. Nicolaysen sent his third letter to plaintiff advising her

18   that, since she had not contacted the CCPOA to further discuss her return to work, had not

19   returned to work, and had not produced a doctor's statement excusing her from returning to

20   work, the CCPOA regarded her as having resigned her position and thus notified her that she

21   was no longer employed by the CCPOA.  At the time Mr. Nicolaysen sent this letter, plaintiff,

22   with the exception of the four hours that she worked on March 6, 2006, had not worked at the

23   CCPOA in over three months.

24          Plaintiff seemingly justifies her failure to communicate directly with defendant by

25   contending that Dr. Becker's reports did not authorize her return to work until June 8, 2006.

26   (Pl.'s Opp'n at 6.)  This is an incorrect understanding of Dr. Becker's reports.  On April 19,

13

1  2006, the CCPOA received a letter from Dr. Becker indicating that plaintiff could return to work

2  on modified duties from April 19 to May 4, 2006.  The modification noted by Dr. Becker was

3  that plaintiff would work for that fifteen-day period under a supervisor other than Ms. Rollins.

4  Dr. Becker also found that plaintiff was to not work from May 4 to May 10, but may work from

5  May 11, 2006 to June 8, 2006 under modified conditions, again the modification being that

6  plaintiff "not work under the authority of her primary supervisor . . . ."  Plaintiff, however, did

7  not return to work during any of these periods or at any time thereafter, and did not contact the

8  CCPOA any further about her employment.

9           Based thereon, the court finds defendant's decision to terminate plaintiff's

10  employment to be on account of plaintiff's failure to communicate with defendant and her failure

11  to report to work for over three months, not on account of her disability.

12           For the reasons stated, the court finds that plaintiff's work-related stress is not a

13  recognized disability under the ADA, <u>see</u> <u>Weiler</u>, 101 F.3d at 524-25 (holding that stress

14  associated with working for a particular supervisor is not recognized as a disability under the

15  ADA), that defendant did offer a reasonable accommodation, and that plaintiff's employment

16  was terminated because of her failure to report to work.  The court therefore grants summary

17  judgment on this claim.

18  /////

19  **2.      The Equal Pay Act**

20           Plaintiff also claims the CCPOA violated the EPA by paying Mr. Guerriero more

21  than they paid her for performing the same job duties that required the same amount of skill,

22  effort and responsibility.

23           The Equal Pay Act provides in relevant part:

24           No employer having employees subject to any provisions of this
         section shall discriminate, within any establishment in which such
25           employees are employed, between employees on the basis of sex by
         paying wages to employees ... at a rate less than the rate at which he
26           pays wages to employees of the opposite sex in such establishment

14

> for equal work on jobs the performance of which requires equal skill,
> effort, and responsibility, and which are performed under similar
> working conditions....

29 U.S.C. § 206(d)(1).

In an EPA case, the plaintiff has the burden of establishing a prima facie case of discrimination by showing that employees of the opposite sex were paid different wages for equal work. Stanley v. University of Southern California, 178 F.3d 1069, 1073-74 (9th Cir. 1999). To make out a prima facie case, the plaintiff bears the burden of showing that the jobs being compared are "substantially equal." See 29 C.F.R. § 1620.13(a); see also Spaulding v. University of Wash., 740 F.2d 686, 697 (9th Cir. 1984), overruled on other grounds, Atonio v. Wards Cove Packing Co., Inc., 810 F.2d 1477 (9th Cir. 1987) (en banc). Significantly, under the EPA, the plaintiff need not demonstrate that the jobs in question are identical.

Courts employ a two-step "substantially equal" analysis in EPA cases. Stanley, 178 F.3d at 1074. "The crucial finding on the equal work issue is whether the jobs to be compared have a 'common core' of tasks, i.e. whether a significant portion of the two jobs is identical." Id. (citing Brobst v. Columbus Srvs. Int'l, 761 F.2d 148, 156 (3d Cir. 1985).) When a plaintiff establishes such a "common core of tasks," the court must then determine whether any additional tasks, incumbent on one job but not the other, make the two jobs "substantially different." Stanley, 178 F.3d at 1074.

The EPA also establishes four exceptions wherein differing salaries are made to employees of opposite sexes "pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1).

Plaintiff argues Mr. Guerriero trained her to perform his job in its entirety and relied upon her to perform those tasks that he was unable to perform. Plaintiff also contends that, at a minimum, her pay should have begun on the lowest tier but on the same pay scale as Mr. Guerriero at the time of her transition to the Membership Department. She asserts that Ms.

15

1  Sewall deliberately maintained plaintiff on the General Secretary pay scale so as to prevent her

2  from having the same pay scale as Mr. Guerriero.

3          A review of the record reveals that plaintiff has not met her burden of establishing

4  a prima facie case of discrimination.  Although plaintiff does not identify with particularity the

5  duties she performed in the Membership Department as compared to those performed by Mr.

6  Guerriero, she does state summarily that they performed "the same job duties" and refers to an

7  exhibit attached to her opposition in which she submits an email from Mr. Guerriero apparently

8  concerning plaintiff's training.  (See Pl's Opp'n, Ex. 11.)

9          Defendant, on the other hand, cites to numerous duties performed solely by Mr.

10  Guerriero: (1) Mr. Guerriero ran a variety of reports regarding membership information; (2) Mr.

11  Guerriero interfaced with the CCPOA Information Technology Department on the types of

12  membership reports that were needed and their formatting; (3) Mr. Guerriero worked with the

13  State of California to keep membership records accurate; (4) Mr. Guerriero regularly reported on

14  membership trends to the Chief of Logistics; (5) Mr. Guerriero oversaw certain portions of the

15  Victims March on the Capital event; and (6) Mr. Guerriero ran the merchandise booth at the

16  annual CCPOA conventions.

17          In light of plaintiff's failure to meet her burden and defendant's reference to

18  numerous duties performed solely by Mr. Guerriero, the court does not find that the positions

19  had a "common core" of tasks.  See Stanley, 178 F.3d at 1074.

20          Even assuming there were a "common core" of tasks and plaintiff raised a

21  genuine issue of fact as to whether the positions were substantially different, a defendant may

22  rebut a prima facie case by showing that the disparity in pay is a "differential based on any . . .

23  factor other than sex.  29 U.S.C. § 206(d)(1); Stanley, 178 F.3d at 1074.  Defendant submits that

24  the difference in pay between plaintiff and Mr. Guerriero was due to the latter's seniority over

25  plaintiff (he was hired 18 months prior to plaintiff and spent his entire tenure at CCPOA in the

26  Membership Records Department) and his enrollment in a different pay scale than plaintiff.

16

1  "Where the defendant demonstrates that a pay differential was based on a factor

2  other than sex, the employee may prevail by showing that the employer's proffered

3  nondiscriminatory reason is a 'pretext for discrimination.'"  <u>Maxwell v. City of Tucson</u>, 803

4  F.2d 444, 446 (9th Cir. 1986).  Plaintiff has not rebutted defendant's nondiscriminatory reason.

5  To the contrary, plaintiff admits in her deposition that the difference in pay was due to Mr.

6  Guerriero's seniority in the Membership Department, that her claim would be the same if Mr.

7  Guerriero was a woman, and that she was unsure whether the difference in pay was attributable

8  to her gender.  (Benson Dep. at 226-29, 234.)

9  In fact, it is clear that the essence of plaintiff's claim is not that she and Mr.

10  Guerriero should have been paid the same amount for equal work, but instead that she should

11  have been on the same pay scale as Mr. Guerriero – that is, she should have been on the

12  Membership Records Clerk pay scale rather than the General Secretary pay scale, even if

13  moving into the new pay scale implied that she would be making less than Mr. Guerriero.  (<u>See</u>

14  Benson Dep. at 229, 233-34.)  This, however, is not a claim recognizable under the EPA.

15  Accordingly, the court grants summary judgment on this claim.

16  **CONCLUSION**

17  In accordance with the above, IT IS HEREBY ORDERED that judgment be

18  entered in favor of defendant on all claims presented in the amended complaint on file herein and

19  that this action be dismissed.

20  DATED: February 23, 2010.

21

22

23  UNITED STATES MAGISTRATE JUDGE

24  /014; bens0886.msj

25

26

17